UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| MARIO KEELEN,<br><br>   Plaintiff,<br><br> v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>   Defendant. | Case No. 19-cv-00461-LB<br><br>**ORDER GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING DEFENDANT'S CROSS-<br>MOTION FOR SUMMARY<br>JUDGMENT**<br><br>Re: ECF No. 19, 24 |

**INTRODUCTION**

  Plaintiff Mario Keelen seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA").[1] The plaintiff moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without

---

[1] Pl. Mot. – ECF No. 19. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 1.

[3] Cross-Mot. – ECF No. 24.

ORDER – No. 19-cv-00461-LB

oral argument. All parties consented to magistrate-judge jurisdiction.[4] The court grants in part the plaintiff's motion for summary judgment, denies the Commissioner's cross motion, and remands for further proceedings.

## STATEMENT

### 1. Procedural History

On December 11, 2014, the plaintiff filed an application for SSI benefits under Title XVI, alleging paranoia, panic attacks, anxiety, depression, post-traumatic stress disorder ("PTSD"), knee injury, and chronic back problems.[5] The Commissioner denied his SSI claim initially and upon reconsideration.[6] On January 21, 2016, the plaintiff requested a hearing.[7]

On August 3, 2017, Administrative Law Judge Richard P. Laverdure (the "ALJ") held a hearing[8] and then held a supplemental hearing on December 5, 2017.[9] At the supplemental hearing, the ALJ heard testimony from medical expert Joseph M. Malancharuvil, Ph.D., and vocational expert ("VE") Timothy J. Farrell.[10] The ALJ issued an unfavorable decision on January 5, 2018.[11] The Appeals Council denied the plaintiff's request for review on November 30, 2018.[12] The plaintiff timely filed this action for judicial review and filed a motion for summary judgment.[13] The Commissioner filed a cross-motion for summary judgment.[14]

---

[4] Consent Forms – ECF Nos. 4, 11.

[5] Compl. – ECF No. 1 at 1; Pl. Mot. – ECF 19 at 4–5; Administrative Record ("AR") 13, 76. The plaintiff initially alleged an onset date of January 1, 1994, but later amended the onset date to September 20, 2013. *See* AR 13, 49.

[6] AR 13, 76–89, 91–109.

[7] AR 13, 136.

[8] AR 33.

[9] AR 47.

[10] AR 48.

[11] AR 13–27.

[12] AR 1–3.

[13] Compl. – ECF No. 1; Pl. Mot. – ECF 19.

[14] Cross-Mot. – ECF No. 24.

United States District Court
Northern District of California

## 2. Summary of Administrative Record

### 2.1 Medical Records

#### 2.1.1 Atascadero State Hospital — Examining

The plaintiff was admitted to Atascadero State Hospital on May 23, 2002 while he was incarcerated under California Welfare & Institutions Code § 6602.[15] The plaintiff reported a history of criminal convictions, including rape and burglary.[16] He admitted to a history of drug use, starting at age 15, "consist[ing] of marijuana, cocaine and alcohol."[17] The staff psychiatrist, Anton Haidinyak, M.D., noted that the plaintiff's "cognition/comprehension appeared to be within normal range and IQ estimate is below normal."[18] The plaintiff was able to do a number of tasks, including "recall[ing] four objects in five minutes without any difficulty."[19] Dr. Haidinyak diagnosed the plaintiff with paraphilia, polysubstance dependence, and antisocial personality disorder.[20] The plaintiff was discharged on December 7, 2005.[21]

#### 2.1.2 Martinez Detention Facility — Treating

From December 2012 to December 2014, the plaintiff received evaluations and treatments from clinicians at the Martinez Detention Facility of the Contra Costa Health Services.[22] On his first admission on December 9, 2012, mental-health clinician Margaret Robbins noted that the plaintiff "reports hearing voices and regular use of marijuana" and was "agitated and irritable."[23]

---

[15] AR 328, 332, 334, 336–37. Under California Welfare & Institution Code § 6602, "[u]pon the commencement of the probable cause hearing" determining whether a person is "likely to engage in sexually violent predatory criminal behavior" after release, such person "shall remain in custody" pending the hearing. *See* Cal. Welf. & Inst. Code § 6602(a).

[16] AR 328, 334.

[17] AR 329.

[18] AR 330, 337.

[19] *Id.*

[20] AR 331, 338, 340.

[21] AR 334.

[22] *See, e.g.*, AR 348–93.

[23] AR 349.

In April 2013, the plaintiff had a psychiatric assessment.[24] During the intake process, he reported feeling "fearful" and "anxious" and described feeling uncomfortable around groups of people.[25] He was afraid of "how people will perceive him" and reported "hear[ing] people mumbling—[and] thinks they are talking [about] him."[26] Daniel May, M.D., performed the initial psychiatric assessment[27] and, in examining the plaintiff's mental status, noted that that his mood was "remarkable" for "depression" and "low energy."[28] Dr. May reported the following diagnoses: Major Depressive Disorder, PTSD, Amphetamine Dependence, and Borderline Personality Disorder.[29] He prescribed Paxil and advised the plaintiff to refrain from drug use.[30]

From June 20, 2013 to July 23, 2013, the plaintiff received psychiatric treatment on an outpatient basis at the Martinez Detention Facility.[31] On June 26, 2013, Dave Singh Auluck, M.D., evaluated the plaintiff during an initial psychiatric consultation and noted that the plaintiff had a "dysphoric" affect.[32] Dr. Auluck assessed that the plaintiff had a mood disorder (not otherwise specified) and prescribed Paxil.[33] The plaintiff continued his psychotherapy and taking Paxil.[34] The record reflects that the plaintiff last used crystal meth in October 16, 2013.[35]

By February 5, 2014, the plaintiff apparently had joined a residential program called the House of Change in Oakland, California.[36] He told Dr. May that he was participating in a "90 day

---

[24] AR 424–31

[25] AR 424.

[26] AR 427.

[27] AR 428–31. Although Dr. May did not write his first name in the initial psychiatric assessment report, the record shows that his first name is Daniel. *See* AR 442.

[28] AR 429.

[29] *See* AR 430. *See also* Pl.'s Mot – ECF 19 at 6.

[30] AR 430.

[31] AR 370–84

[32] AR 372.

[33] *Id.*

[34] *See* AR 442, 457, 459, 465, 469.

[35] AR 348, 359, 370, 385, 396, 401, 407, 412, 415.

[36] AR 470.

Residential program" and that he was "in charge of the janitorial part of the whole program."[37]

Dr. May noted that the plaintiff was benefitting from the Paxil.[38] Dr. May assessed the plaintiff's

mental status as "mood euthymic and with a dynamic range, not pressured or elevated[;] no

psychotic features or ideas of reference, no irritability or anxiety, no obsessive or ruminative

features, not suicidal or homicidal."[39]

On April 30, 2014, Dr. May conducted an annual update for the plaintiff's assessment.[40] He

described the plaintiff as "doing very well" at the recovery program.[41] He noted that the plaintiff

had a long history of polysubstance dependence, and the substance use caused the plaintiff to

become "paranoid and quite disorganized."[42] The plaintiff's mood appeared to be euthymic during

the exam, and his thinking was "rational."[43] Dr. May diagnosed the plaintiff with major depressive

disorder and continued to prescribe him with Paxil.[44] The plaintiff continued to see Dr. May for

the rest of 2014.[45]

On January 7, 2015, the plaintiff experienced "a major relapse" of depression.[46] He was not

taking his Paxil and was having conflicts with another peer in the recovery program.[47] Dr. May

observed the plaintiff to be "more depressed with low mood."[48] He noted the plaintiff's "anxiety,

poor sleep, decreased concentration, and trouble with motivation."[49]

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] AR 436, 474.

[41] AR 436.

[42] *Id.*

[43] *Id.*

[44] AR 437 (noting "Axis I 296.32; MDD recurrent, moderate" under "diagnosis"); AR442.

[45] AR 478 (visit on July 23, 2014), 481 (visit on September 24, 2014), 485 (visit on November 26, 2014).

[46] AR 487.

[47] *Id.*

[48] *Id.*

[49] *Id.*

### 2.1.3    Pacific Health Clinic, Dr. Aparna Dixit — Examining Psychologist

On August 3, 2015, Aparna Dixit, PsyD, performed a psychological evaluation of the plaintiff in connection with his social-security claim.[50] The plaintiff "rode his bike to the evaluation and arrived on time for the appointment."[51]

For the plaintiff's mental-status and behavioral examination, Dr. Dixit observed:

> [The plaintiff] was mildly disheveled with fair hygiene and grooming. His eye contact was adequate. No visual hindrance was noted during this evaluation. He was alert and oriented to place, time, person, and situation. His speech was clear, spontaneous, and coherent. He had no difficulty with hearing during this evaluation. His comprehension skills appeared to be intact. His affect was appropriate and his mood which was dysthymic. There were no signs of delusions or hallucinations observed during this evaluation. Thought process was linear and goal directed and thought content was logical. He denied current suicidal or homicidal ideation. His insight was fair and judgment was intact.

> During the testing process itself, the claimant was cooperative and he displayed adequate effort. He demonstrated mildly decreased attention and concentration during the evaluation. He had no difficulty answering questions requiring common sense and abstract reasoning. He had no difficulty solving simple math problems within a time limit. He was able to spell the word WORLD forward and backward. He was able to state the current president of the United States. He was able to state the name of the capital of California but not the current Governor of California. He was able to do serial 3s but not 7's correctly. Throughout the examination he maintained an even pace and demonstrated adequate persistence.[52]

Dr. Dixit reported that the plaintiff's verbal comprehension, perceptual reasoning, working memory, and full-scale IQ fell in the low-average range.[53] The plaintiff's testing also "suggest[ed] mild impairment in organizing, sequencing, and engaging in tasks requiring mental flexibility."[54]

Dr. Dixit's diagnostic impressions included depressive disorder and polysubstance abuse.[55] He reported that the evaluation revealed that the plaintiff had "some cognitive deficits."[56] "No

---

[50] AR 496–97.

[51] AR 497.

[52] AR 498–99.

[53] AR 499.

[54] *Id.*

[55] AR 500.

[56] *Id.*

symptoms suggesting a trauma based disorder were evident."[57] The plaintiff's depression and anxiety "appear[ed] to be responding to psychiatric treatment."[58] As for plaintiff's work-related functioning, Dr. Dixit noted "mild" impairment for the following abilities: follow/remember complex/detailed instructions; maintain adequate pace or persistence to perform complex tasks; maintain adequate attention/concentration; maintain emotional stability/predictability; interact appropriately with the public on a regular basis; and perform tasks requiring mathematics skills.[59]

### 2.1.4    Bayview Medical Clinic, Dr. Omar C. Bayne — Examining

On August 27, 2015, Omar C. Bayne, M.D., conducted an orthopedic evaluation on the plaintiff for his lower-back pain and right-knee pain.[60] Dr. Bayne reported the following diagnostic impressions: (1) chronic recurrent low back strain/sprain; (2) lumbar spondylosis; and (3) internal derangement right knee, possibly medial meniscus tear right knee.[61] In terms of the plaintiff's functionality, Dr. Bayne noted that the plaintiff "required a use of cane or walking aids to prevent giving out of the right knee." [62] He observed that the plaintiff "should be able to lift and carry 10 pounds frequently and 20 pounds occasionally."[63] He concluded that the plaintiff "should be able to work in any work environment except on unprotected heights."[64]

### 2.1.5    Lifelong Trust Health Center

#### 2.1.5.1    Matthew Fentress — Treating Physician

On February 9, 2016, the plaintiff went to his primary-care physician, Matthew Fentress, M.D., and appeared to be in crisis.[65] Dr. Fentress referred him to Licensed Clinical Social Worker

---

[57] *Id.*

[58] *Id.*

[59] AR 500–01.

[60] AR 504.

[61] AR 506.

[62] *Id.*

[63] *Id.*

[64] AR 507.

[65] AR 597.

("LCSW") Kari Jennings-Parriott for psychotherapy.[66] Ms. Jennings-Parriott noted "depressed" mood and "flat" affect in the plaintiff.[67] She referred the plaintiff back to Dr. Fentress for medication support.[68]

In March 2016, Dr. Fentress referred the plaintiff to see Ted Aames, PhD, a psychologist, for his "severe recurrent major depressive disorder with psychotic features with anxious distress."[69] For the plaintiff's pain in right knee and back, Dr. Fentress continued to order pain medication (ibuprofen) as treatment.[70] In April 2016, Dr. Fentress referred the plaintiff to physical therapy for his bilateral lower back pain.[71]

In May 2016 and July 2016, the plaintiff visited Dr. Fentress for alcohol withdrawal.[72] During the May visit, Dr. Fentress prescribed Chloridizepoxide for the plaintiff's shaking and anxiety resulting from alcohol withdrawal.[73] He prescribed the same in July in addition to a prescription for naltrexone "for maintenance of abstinence" from alcohol.[74]

### 2.1.5.2    Ted Aames, Ph.D — Treating Psychologist

From March 2016 to July 2017, the plaintiff met with Dr. Aames, on a roughly bi-monthly basis for psychotherapy.[75] On March 10, 2016, Dr. Aames held a session lasting 90 minutes and conducted a psychiatric diagnostic evaluation.[76] The plaintiff complained of "'anxiety' and 'depression' and feeling 'scared to death.' . . . [and] 'fearful for [his] life.'"[77] He told Dr. Aames

---

[66] AR 599.

[67] AR 517.

[68] AR 518.

[69] AR 595.

[70] AR 594–96.

[71] AR 592.

[72] AR 589, 586.

[73] AR 589.

[74] AR 586.

[75] *See* AR 574, 715.

[76] AR 574.

[77] AR 575.

that "he is fearful of someone putting a bullet in his head."[78] Dr. Aames reported that the plaintiff

experienced symptoms "consistent with anxiety, depression, and panic disorder including severe

and persistent depressed mood, loss of interest, sleep disturbance . . . and [symptoms]

characteristic of recurrent panic attacks with persistent worry about having additional panic attacks

and their consequences."[79] The plaintiff described a history of "emotional state symptomatic of

personality disorder . . . and marked impairments in developing close relationships."[80]

Dr. Aames observed the plaintiff to be "anxious and depressed."[81] He noted that the plaintiff

apparently experienced auditory hallucinations "all the time."[82] Specifically, the plaintiff reported

hearing "voices that tell him that others are going to harm him that say things like, 'Yeah, we

know what he did and we're gonna get you.'"[83] The plaintiff "reported [that] he is 'convinced'

others are always talking about him because they know about his past."[84] Dr. Aames noted the

plaintiff's history of substance abuse, including cocaine dependence.[85] The plaintiff told

Dr. Aames that he was not using any drugs at this time and had stopped using cocaine a few years

ago.[86] Dr. Aames noted that the plaintiff "continues to report and exhibit severe psychological

symptoms after years of abstinence."[87] Under "assessment," Dr. Aames listed: "severe recurrent

major depressive disorder with psychotic features with anxious distress," "panic disorder," and

"mix[ed] personality disorder."[88]

---

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] AR 577.

[86] *See id.*

[87] *Id.*

[88] AR 578. Dr. Aames also noted "employment problem," "extreme poverty," and "housing problems."

On April 12, 2016, Dr. Aames completed a "mental impairment questionnaire" regarding the plaintiff.[89] He described the following clinical findings about the plaintiff: "persistent anxiety, depressed mood, sleep disturbance, fear, muscle tension, diminished ability to concentrate, hypervigilance, [history of] fleeting suicidal ideation, recurrent panic attacks."[90] Dr. Aames noted that the plaintiff's depression "magnifies pain," which in turn "worsens symptoms of depression."[91] When asked whether the plaintiff's impairments would remain as severe in the absence of substance abuse, Dr. Aames responded "seemingly."[92] He explained that the plaintiff "reported a pattern of alcohol use that appears to be in the form of periodic binge drinking" to alleviate his symptoms and negative moods.[93] Dr. Aames noted that the plaintiff purportedly stopped using cocaine "a few years ago," but that "he continues to report and exhibit severe psychological Sx [symptoms] after years of reported abstinence and during his detention at Atascadero State Hospital from 5/23/02 to 12/7/05."[94] Dr. Aames also found that the plaintiff's ability to sustain an ordinary routine without special supervision was "extremely impaired.[95] He anticipated that plaintiff's impairments would interfere with the plaintiff's concentration or pace of work for 50% of the day.[96] He also estimated that the plaintiff's impairment would cause the plaintiff to be absent from work for "more than four days per month."[97] Dr. Aames concluded that, given his history, the plaintiff would not be the best vocational candidate and that his "past and current functioning reveals a person who is chronically dysfunctional."[98]

---

[89] AR 510.

[90] AR 510.

[91] Id.

[92] Id.

[93] Id.

[94] Id.

[95] AR 512. Dr. Aames also found varying levels of impairment for the plaintiff's other work-related mental abilities. See id.

[96] AR 513.

[97] Id.

[98] Id.

The plaintiff continued his psychotherapy sessions with Dr. Aames through 2016.[99] During this time, Dr. Aames noted periods of time when the plaintiff was drinking less and times when the plaintiff drank more. On August 31, 2016, the plaintiff reported making it through alcohol withdrawal and had "only a few sips" after he stopped his medication.[100] On September 16, 2016, the plaintiff reported only "one standard drink" in the prior week.[101] During this session, Dr. Aames observed that the plaintiff "continues to evince extreme/consistent distrust of others, apprehensive expectation of being exploited/harmed, and isolative [behavior] due to fear of being hurt or taken advantage of."[102]

Similarly, on October 3, 2016, the plaintiff reported to Dr. Aames that he was drinking "with much less frequency and quantity."[103] Dr. Aames observed that the plaintiff continued to experience "PTSD related nightmares almost every night, which interfere with sleep and mood[;] [He] [a]lso reports depressed mood and severe anxiety, despite the increase of Paxil . . . which is no longer beneficial."[104] Two weeks later, the plaintiff reported that he had increased his alcohol use to "1/2 pint of distilled spirits three times per week."[105] He also reported "concerns regarding increased difficulties with paranoid ideation, auditory hallucinations, sleep disturbance, and hypervigilanc[e]."[106] On November 21, 2016, the plaintiff again reported "drinking less."[107] Dr. Aames revised the plaintiff's diagnosis from panic disorder to chronic PTSD because of his "persistent and severe PTSD Sx [symptoms] of re-experiencing, avoidance, numbness, and

---

[99] AR 527, 530, 532, 534, 559, 557, 561, 555, 553, 550, 548, 543, 710, 708, 703, 699, 692, 685, 674, 671 (listed in chronological order of visits in 2016).

[100] AR 708.

[101] AR 704.

[102] Id.

[103] AR 701.

[104] Id.

[105] AR 693.

[106] AR 692.

[107] AR 685.

hyperarousal."[108] By December 2016, Dr. Aames observed that the plaintiff continued to struggle with anxiety and paranoia (but had "decreased dysphoria and increased hopefulness.")[109]

The plaintiff continued to see Dr. Aames throughout 2017 on a bimonthly basis.[110]

On July 21, 2017, Dr. Aames completed a second "mental impairment questionnaire" and reported the following diagnoses: chronic PTSD; major depressive disorder ("MDD") with "psych. features"; "other specified personality" disorder with mixed features; moderate "alcohol use" disorder.[111] He documented the plaintiff's symptoms, including delusions or hallucinations, depressed mood, observable psychomotor agitation or retardation, distrust or suspiciousness of others, panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences, detachment from social relationships, and involuntary re-experiencing of a traumatic event.[112] He reported moderate to marked degrees of limitation for the plaintiff's ability to understand, remember, and apply information, "marked" limitations for the plaintiff's ability to interact with others, moderate to extreme limitations for the plaintiff's ability to concentrate, persist, or maintain pace, and mild to marked limitations for the plaintiff's ability to adapt or manage self.[113] He found that the plaintiff's impairments would not improve in the absence of drug or alcohol abuse.[114] He estimated that the plaintiff would miss work for "4 days or more" per month on average because of his impairments.[115] He anticipated that the plaintiff would be "off-task" at a work environment for "more than 30%" of the work day.[116]

---

[108] AR 686.

[109] *See* AR 674 (plaintiff expressing that he is a "paranoid man" at December 7, 2016 session), 672 (plaintiff continues to struggle with "fear, paranoia, and low self-esteem . . . resulting in feelings of depression" at December 21, 2016 session).

[110] AR 669, 667, 659, 657, 655, 650, 648, 646, 641, 639, 637, 635, 716 (listed in chronological order of visits).

[111] AR 716.

[112] AR 717.

[113] AR 718–19.

[114] AR 720.

[115] *Id.*

[116] *Id.*

Dr. Aames concluded that the plaintiff, because of his impairments, is "chronically dysfunctional."[117]

### 2.1.5.3    Aisling Bird, M.D. — Treating Psychiatrist

On July 29, 2016, the plaintiff began seeing psychiatrist Dr. Aislinn Bird.[118] Dr. Bird met with the plaintiff to address his anxiety.[119] Dr. Bird reported that "if [Mr. Keelen's] anxiety and panic are better treated, patient may have more success in achieving his goal of sobriety from alcohol."[120] Dr. Bird diagnosed the plaintiff with "anxiety disorder, unspecified" and "alcohol use disorder, moderate, dependence."[121] She prescribed an increased dosage of Paxil for the plaintiff's anxiety, panic, and depression.[122] She also put the plaintiff on hydroxyzine for his anxiety.[123]

On August 19, 2016, the plaintiff, while withdrawing from alcohol, met with Dr. Bird.[124] Dr. Bird prescribed Librium to treat the plaintiff's alcohol-use disorder.[125] She encouraged the plaintiff to attend alcoholics anonymous ("AA") meetings, but noted that it "might not be the best fit for the patient given his anxiety."[126] In a follow-up appointment on September 2, the plaintiff reported that "overall[,] he is doing much better."[127] He was drinking about one pint [of liquor] every other day, and the "alcohol helps with [] [his] continued severe anxiety."[128] Dr. Bird noted that "[d]espite the increase in Paxil, [] [Mr. Keelen] continues to endorse anxiety daily, especially in social settings . . . [and] PTSD related nightmares almost every night, which interferes with his

---

[117] AR 721.

[118] AR 545.

[119] AR 546.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] AR 664.

[125] AR 666.

[126] *Id.*

[127] AR 705.

[128] AR 706.

sleep and mood."[129] Consequently, Dr. Bird prescribed the plaintiff with sertraline and zoloft for the plaintiff's depressive disorder, anxiety disorder, and PTSD.[130]

The treatment records also reveal the plaintiff's fluctuating alcohol consumption. On December 1, 2016, Dr. Bird noted that the plaintiff was drinking one pint of liquor a day instead of two pints.[131] She reported that the plaintiff's depression "has improved some," and his nightmares were less frequent.[132] She observed that the plaintiff "continues to feel anxious, especially in crowds."[133] She encouraged AA meetings for the plaintiff, but the plaintiff found the meetings "difficult due to social anxiety."[134]

The plaintiff continued to see Dr. Bird in 2017.[135] During these visits, the plaintiff reported reducing alcohol use.[136] Dr. Bird continued to treat the plaintiff for anxiety, PTSD, and depression.[137]

### 3. Administrative Proceedings

#### 3.1 Disability Determination Explanation (DDE)

During the administrative process, non-examining doctors generated two disability determination explanations ("DDE"), one related to the plaintiff's initial application and one at the reconsideration level.

In September 2015, at the initial level, the non-examining doctors found that the plaintiff had the following severe impairments: major joints dysfunction and affective disorders.[138] They

---

[129] *Id.*

[130] AR 707.

[131] AR 678.

[132] *Id.*

[133] *Id.*

[134] AR 679.

[135] AR 661, 652, 643 (listed in chronological order of visits).

[136] *See, e.g.*, AR 661, 652.

[137] AR 663, 654. *See also* AR 645.

[138] AR 83.

determined, however, that the plaintiff's conditions were not severe enough to keep him from working.[139] I. Herman, M.D., analyzed the plaintiff's physical residual-functional capacity ("RFC").[140] He found that the plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for a total of 4 hours, and sit for a total of about 6 hours.[141] The plaintiff had postural limitation and could occasionally climb ramps, stairs, ladders, ropes, and scaffolds.[142] Dr. Herman also found that the plaintiff could occasionally stoop, kneel, crouch and crawl.[143] Anna M. Franco, Psy. D., assessed the plaintiff's mental RFC.[144] She found that the plaintiff had moderate limitation to understand and remember detailed instructions.[145] The plaintiff also was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods.[146] He had moderate limitations in his ability to interact with the public.[147] Because the plaintiff's conditions were not severe enough to keep him from working, the doctors determined that he was not disabled.[148]

On reconsideration, the plaintiff alleged that he "want[s] to be alone" and that he has "gotten worse and . . . [has had] a difficult time getting along with people."[149] He also alleged that his back problems worsened and that he has chronic pain.[150] The doctors found the same impairments and added one more severe impairment: Substance Addiction Disorders.[151] Plaintiff's RFC

---

[139] AR 89.

[140] AR 85–86. The record does not reflect Dr. Herman's first name.

[141] AR 85.

[142] *Id.*

[143] *Id.*

[144] AR 86–88.

[145] *Id.*

[146] AR 87.

[147] *Id.*

[148] AR 88.

[149] AR 92.

[150] *Id.*

[151] AR 99.

determinations remained the same, except that Jorge Pena, Ph.D., also found the following moderate limitations: ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to set realistic goals or make plans independently of others.[152] The plaintiff was again determined "not disabled."[153]

## 3.2   Administrative Hearing

On August 3, 2017, a hearing was held, and the plaintiff testified. On December 5, 2017, the ALJ held a supplemental hearing, and the plaintiff, the medical expert ("ME"), and the vocational expert ("VE") testified.

### 3.2.1   Plaintiff's Testimony

The plaintiff appeared and testified at the initial hearing on August 3, 2017, represented by his attorney Katherine Ammirati.[154]

The ALJ questioned the plaintiff. The plaintiff testified he was not currently working.[155] He explained that, in 2006, he worked for his brother doing painting.[156] He also worked part-time in 2015 and 2016 for the Northwest Democracy Resources.[157]

The plaintiff testified that he was not currently using any street drugs.[158] He said that the last time he used drugs was "over a year ago."[159] He denied using alcohol to self-medicate, but said that he would still drink about half a pint "occasionally."[160] He explained that he was being treated

---

[152] *See* AR 107.

[153] AR 109.

[154] AR 35.

[155] AR 36.

[156] AR 37–38.

[157] *Id.*

[158] AR 38.

[159] *Id.*

[160] AR 38–39.

for his "anxiety, depressive [*sic*], [and] paranoia."[161] He said that he was distrustful and suspicious of others and "detached from social relationships."[162] He was "always" feeling depressed, inadequate, guilty and worthless.[163] He "always" had difficulty concentrating, remembering, and retaining information.[164]

The plaintiff reported his criminal background and incarceration.[165] His attorney explained that the plaintiff's PTSD resulted from his many years of incarceration and exposure to violence[166] The plaintiff testified that he felt like "somebody going to kill [him] and like that, fixing that area because of the problems that [he] [has]. So [he's] always fearful."[167]

The plaintiff appeared in person with his attorney at the supplemental hearing on December 5, 2017.[168] He testified the following:

> Whether I'm drinking or not every morning I get up planning somebody will shoot me for what I did in the past. It's scared to death every day and whether I'm drinking or not. You know, things I did and you got people out there I don't live with them all my life when I was incarcerated. Going to do something bad and I have to deal with all day. So that fear going to be there regardless if I'm drinking or not. They have me staying away from people, I don't mess with nobody, I don't—I don't even want to see nobody. That's it.[169]

### 3.2.2   Medical Expert Testimony

The ME, Joseph Malancharuvil, Ph.D., testified at the December 5, 2017 hearing.[170] He said that the plaintiff had alcohol-induced mood disorder, anxiety disorder not otherwise specified,

---

[161] AR 39.

[162] AR 39–40.

[163] AR 40.

[164] AR 40–41.

[165] AR 41–44.

[166] AR 43.

[167] *Id*. Plaintiff's attorney "elected not to argue" for the PTSD listing, however, because "it's the least believed developed." She noted that the "diagnosis is present as far back as 2013."

[168] AR 49.

[169] AR 63.

[170] AR 50.

personality disorder with mixed features, and PTSD.[171] He found that "all these conditions are aggravated by the ongoing use of alcohol."[172] He concluded that if the plaintiff reduced his alcohol consumption or eliminated it, then his functioning would improve.[173] He testified that "the overall evidence is that this claimant is seriously affected by these habits" of alcohol and drug abuse.[174] He disagreed with Dr. Aames's assessment that the plaintiff was chronically dysfunctional even without alcohol.[175] He based this opinion on (what he said) was evidence that the plaintiff did "very well" during periods of sobriety.[176]

In response to questions posed by the plaintiff's attorney, the ME agreed that the plaintiff had a diagnosis of personality disorder during his time at the Atascadero State Hospital, presumably under a period of sobriety.[177] He agreed that the medical record during that period showed that the plaintiff displayed instability of interpersonal relationships, excessive emotionality and attention seeking, and feelings of inadequacy.[178]

### 3.2.3 Vocational Expert's Testimony

The VE, Timothy Farrell, testified at the December 5, 2017 hearing.

The ALJ asked the VE whether there are any unskilled jobs "at the sedentary or light levels" that fit the following hypothetical:

> Assume someone of claimant's age, education and work experience in a capacity
> for sedentary and up to light work with, let's see here, say sedentary and light work,
> we'll rule out ladders, ropes and scaffolds, and we'll eliminate other postural
> activities to occasional and a capacity for moderately complex but not highly
> complex or detailed tasks, mostly routine, no hazardous or fast moving machinery,

---

[171] AR 50–51.

[172] AR 51.

[173] *See* AR 51–52.

[174] AR 53.

[175] AR 54.

[176] AR 55.

[177] AR 56–57.

[178] AR 59.

no responsibility for others safety and no rapid assembly line work. And I would also add in no required public interaction.[179]

The VE concluded that the following jobs were available under the hypothetical: (1) officer helper; (2) mail clerks who just work in-house; (3) garment sorter or tagger; and (4) garment folder.[180] The VE testified that these unskilled jobs would allow one absence per month.[181] He also noted that a person who is off-task 15% of the time would not be able to maintain these jobs, because 10% off-task would be the "maximum acceptable."[182]

### 3.3    Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether the plaintiff was disabled.[183] He first found that, considering the plaintiff's substance use, the plaintiff would be disabled.[184] He then concluded that, because the plaintiff's substance use disorder is a material contributing factor, the plaintiff is not disabled within the meaning of the regulations.[185]

#### 3.3.1    Five-Step Evaluation – Considering Substance Use

The ALJ first analyzed the five-step process and in that analysis, considered the plaintiff's substance use disorder.

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his application date of September 20, 2013.[186]

At step two, the ALJ found that the plaintiff had the following severe impairments: "lumbar strain and spondylosis; right knee osteoarthritis or derangement; alcohol use disorder; alcohol-induced mood disorder, with possible psychotic features secondary to alcohol; anxiety disorder;

---

[179] AR 66–67.

[180] *See* AR 68–70.

[181] AR 71.

[182] AR 72.

[183] AR 13–14.

[184] AR 13.

[185] AR 13–14.

[186] AR 15.

personality disorder with mixed features; and post-traumatic stress disorder (PTSD), mild, chronic."[187]

At step three, the ALJ found that, including the plaintiff's substance-use disorder, the severity of the plaintiff's physical or mental impairments do not meet or medically equal the severity of a listed impairment in the regulations.[188]

Before reaching step four, the ALJ concluded that, based on all the impairments, the plaintiff has the RFC to "perform light work . . . except that he cannot concentrate, persist, or maintain pace or interact appropriately to sustain competitive work."[189] The ALJ reasoned that the record shows that, when the plaintiff was drinking, he had "significantly decreased functioning."[190] In making this determination, the ALJ accorded the most weight to the ME and substantial weight to the treating psychologist Dr. Aames.[191]

At step four, the ALJ found that the plaintiff was unable to perform any past relevant work and that the plaintiff's past relevant work as a construction worker exceeded his RFC.[192]

The ALJ found that, including the substance-use disorder, the plaintiff was "disabled" because there are no jobs that exist in significant numbers in the national economy that he could perform.[193]

### 3.3.2 Five-Step Evaluation — Without Substance Use

The ALJ nevertheless concluded that if the plaintiff stopped his substance use, he would not be disabled.

---

[187] *Id.*

[188] AR 16.

[189] AR 17.

[190] *Id.*

[191] AR 18.

[192] *Id.*

[193] AR 19.

The ALJ found that, without the substance use, the plaintiff would still have "more than minimal limitations" in his ability to perform basic work activities.[194] The plaintiff thus would "continue to have a severe impairments or combination of impairments."[195]

At step three, the ALJ found that, if the plaintiff stopped the substance use, he would not have a physical or mental impairment that meets or medically equals any of the listed impairments in the regulations.[196] Specifically, the ALJ noted that during times when the plaintiff was only drinking "occasionally" or when he was part of the residential recovery program at House of Change, he had only have mild to moderate limitations in his mental impairment.[197]

The ALJ also determined that the plaintiff would have the RFC to "perform light work . . . with no use of ladders, ropes or scaffolds; [and that] he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl . . . and perform moderately complex work."[198] The ALJ found that the plaintiff "should have no responsibility for the safety of others; and he should have no required public interaction."[199] The ALJ reasoned that the record showed that "during periods of sobriety or periods when [the plaintiff] has been using less alcohol, his functioning substantially improve[d] and his mental status examinations [were] near normal."[200] In making this determination, the ALJ accorded the most weight to the ME, substantial weight to the state consultants who performed the DDE, and little weight to the treating psychologist Dr. Aames.[201] He also found that the plaintiff's subjective testimony was not supported by the record.[202] The

---

[194] *Id.*

[195] *Id.*

[196] AR 20.

[197] *Id.*

[198] AR 21.

[199] *Id.*

[200] AR 23.

[201] AR 25.

[202] *Id.*

ALJ therefore concluded that the plaintiff's alcohol-use disorder "is primarily the cause of disabling symptoms and limitations and thus [] is material."[203]

Finally, the ALJ found that, although the plaintiff still would be unable to perform past relevant work, there would be a significant number of jobs in the national economy that he could perform, such as office helper, mail clerk, garment sorter, and garment folder (characterized by the ALJ as representative occupations).[204]

Accordingly, the ALJ concluded that the substance-abuse disorder was a contributing factor material to the determination of disability because the plaintiff would not be disabled if he stopped the substance use, and thus, the ALJ concluded that the plaintiff was not disabled.[205]

## ANALYSIS

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

---

[203] *Id.*

[204] AR 26.

[205] *Id.*

"Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless."

*Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two**. Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. See 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. See 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) finding that the alcohol use was material to the plaintiff's disability determination, (2) giving little weight to the treating psychologist's opinion, (3) giving the most weight to a non-treating non-examining medical expert, (4) failing to consider all relevant medical evidence, (5) failing to fully develop the record, and (6) rejecting the plaintiff's testimony.[206]

### 1. Whether the ALJ Erred by Finding the Alcohol Use Was Material

The plaintiff contends that the ALJ erred by finding that his substance use was a contributing factor material to the determination of disability.[207] He argues that the evidence does not support the ALJ's materiality finding because (1) plaintiff's mental improvements while in jail or a recovery program could be attributed to the highly structured environment as opposed to his purported sobriety, and (2) evidence cited by the ALJ to show plaintiff's increased functioning during periods of limited alcohol use actually showed his continued struggle with mental impairments.[208] The court remands on this ground.

"A finding of 'disabled' under the five-step inquiry does not automatically qualify a claimant for disability benefits." *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). "Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits 'if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the

---

[206] The court notes that the plaintiff does not appear to challenge the ALJ's findings regarding his physical impairments. *See* Pl. Mot. – ECF 19 at 5–6, 9. The court thus does not review those findings.

[207] Pl. Mot. – ECF No. 19 at 8–12.

[208] *Id*. at 12.

United States District Court
Northern District of California

individual is disabled.'" *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting 42 U.S.C. § 423(d)(2)(C)) (alteration in original).

The Ninth Circuit has held that when a Social Security disability claim involves substance abuse, the ALJ must first conduct the five-step sequential evaluation without determining the impact of substance abuse on the claimant. *Bustamante*, 262 F.3d at 954–55. If the ALJ finds that the claimant is not disabled, then the ALJ proceeds no further. *Id.* at 955. If, however, the ALJ finds that the claimant is disabled, then the ALJ conducts the sequential evaluation a second time and considers whether the claimant would still be disabled absent the substance abuse. *Id.* (citing 20 C.F.R. §§ 404.1535, 416.935); *Parra*, 481 F.3d. at 747 (under the Social Security Act's regulations, "the ALJ must conduct a drug abuse and alcoholism analysis" to determine "which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." (citing 20 C.F.R. § 404.1535(b)). The Ninth Circuit has stressed that courts must not "fail to distinguish between substance abuse contributing to the disability and the disability remaining after the claimant stopped using drugs or alcohol." *Kroeger v. Calvin*, 13-cv-05254-SI, 2015 WL 2398398, at *10 (N.D. Cal. May 19, 2015) (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998)). "Just because substance abuse contributes to a disability does not mean that when the substance abuse ends, the disability will too." *Id.* The claimant has the burden to prove that the drug or alcohol abuse is not a contributing factor material to disability. *Parra*, 481 F.3d at 748.

First, evidence of the plaintiff's improved mental conditions under highly structured environments does not answer the question about whether the improvement is due to limited substance use or the environment itself. "Improvements in a co-occurring mental disorder in a highly structured treatment setting, such as a hospital or substance abuse rehabilitation center, may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use." Social Security Ruling, SSR 13-2p.; Title II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA), 78 Fed. Reg. 11939-01, 11945 (Feb. 20, 2013). The substance abuse is not material to the disability "[i]f the evidence in the case record does not demonstrate the separate effects of treatment for [drug addiction and alcoholism ("DAA")] and for the co-occurring mental disorders." *Id*. Here, the ALJ found that the plaintiff's

1  functioning "significantly improved" while he was at the residential recovery program, House of

2  Change.[209] It is unclear from the record and from the ALJ's analysis, however, whether this

3  purported improvement was the result of the structured recovery program or from the plaintiff's

4  sobriety while there. Courts in this district have found materiality is not met where the evidence

5  does not separate the effects of the structured environment and the purported sobriety. *See Belvin*

6  *v. Berryhill*, 18-cv-02637-KAW, 2019 WL 4751875, at *5 (N.D. Cal. Sept. 30, 2019) ("it is

7  impossible to separate the effects of Plaintiff's medication compliance and his residential

8  placement from his abstinence, which, pursuant to SSR 13-2p, requires a finding of immateriality

9  [of Plaintiff's drug use]); *see also Pittaluga v. Comm'n of Social Security*, 18-cv-03067-VC, 2019

10  WL 2897849, at *1 (N.D. Cal. July 5, 2019) (finding it "doubtful" to rely on jail records for

11  accurate mental health portrayal "because the jail environment is highly structured"). The court

12  thus finds that this evidence does not support the ALJ's finding of materiality.

13      Second, the plaintiff contends that the ALJ's cited examples of the plaintiff's increased

14  functioning during periods of lower alcohol use outside of structured environments did not

15  actually support the ALJ's conclusion of materiality.[210] The court agrees.

16      The ALJ cited treatment records in 2016 from the Lifelong Trust Health Center, where the

17  plaintiff reported that he abstained from or limited alcohol use.[211] The ALJ found that, during

18  these sessions, the plaintiff was doing well.[212] The cited evidence, however, does not support that

19  finding. For example, the ALJ cited the plaintiff's session with Dr. Bird on September 2, 2016,

20  and said that the plaintiff, while withdrawing from alcohol, was "doing much better," and his

21  mental status "was generally normal except for anxious mood and minimal insight."[213] The full

22  reading of Dr. Bird's report reveals that the plaintiff, "[d]espite the increase in Paxil, [] continues

---

[209] AR 24.

[210] Pl. Mot. – ECF No. 19 at 12.

[211] AR 24.

[212] *Id.*

[213] *Id.*; AR 705–06.

to endorse anxiety daily, especially in social setting . . . [and] PTSD related nightmares almost every night."[214] Similarly, the ALJ noted that the plaintiff reported "drinking with much less frequency and quantity" on October 3, 2016.[215] Dr. Aames noted during this session, however, that the plaintiff still reported "depressed mood and severe anxiety" and "PTSD related nightmares almost every night."[216] The ALJ also cited records from December 2016, where the plaintiff was reporting to be drinking less and less depressed and more hopeful.[217] The records that the ALJ relied on show that, despite some improvement, the plaintiff "[c]ontinue[d] to feel anxious" and "continue[d] to struggle with fear, paranoia, and low self-esteem . . . resulting in feelings of depression."[218]

In sum, the ALJ erred by finding that the plaintiff's alcohol use was material. The court thus remands on this ground.

## 2. Whether the ALJ Erred in Weighing the Treating Psychologist and ME's Opinions

The plaintiff next argues that the ALJ erred by improperly overweighing the ME's opinion and underweighing treating-psychologist Dr. Aames's opinion. The court remands on this ground too.

The ALJ is responsible for "'resolving conflicts in medical testimony and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence.

---

[214] AR 706.

[215] AR 24.

[216] AR 701.

[217] AR 24.

[218] AR 677–78 (December 1, 2016 session with Dr. Bird); 671–72 (December 21, 2016 session with Dr. Aames). The ALJ also cited to plaintiff's session with Dr. May in September 6, 2013 as evidence that the plaintiff was doing better without alcohol abuse. AR 23–24. Dr. May's psychiatric notes from this session, however, does not report the plaintiff's substance use at the time. AR 458–459. Dr. May only notes that the plaintiff was "taking a class in human adjustment" and "struggling to think about joining a residential program." AR 458. This does not support a finding this was a period of less alcohol use, during which the plaintiff was improving. *See* AR 23.

20 C.F.R. § 416.927(b); *see Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).[219] Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). "The opinions of non-treating or non-examining physicians

---

[219] The Social Security Administration promulgated new regulations, including a new, effective March 27, 2017. The previous version, effective to March 26, 2017, applies here. *See* 20 C.F.R. § 404.614(a) "[A]n application for benefits, or a written statement, request, or notice is filed on the day it is received by an SSA employee at one of our offices or by an SSA employee who is authorized to receive it at a place other than one of our offices."

may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [his] conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion…" *Orn*, 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

Dr. Aames's opinion was contradicted by the ME's opinion.[220] The ALJ was thus required to articulate specific and legitimate reasons supported by substantial evidence in the record. *Garrison*, 759 F.3d at 1012–13.

The court first finds that the ALJ erred when it accorded the most weight to the ME's opinion without providing a substantive basis for why the ME was more persuasive. The ALJ reasoned only that the ME "had the opportunity to review all of the medical evidence of record and his opinion is consistent with the record as a whole."[221] Such a conclusory basis, however, does not adequately explain why the ME's opinion should be accorded the most weight.

Furthermore, the ALJ also erred in according Dr. Aames's opinion little weight. Dr. Aames found that the plaintiff's "impairments could not be expected to improve in the absence of drug or alcohol abuse."[222] The ALJ found that Dr. Aames's opinion was "inconsistent with the treatment records . . . showing that the claimant's functioning improved significantly during periods of

---

[220] AR 54.

[221] AR 25.

[222] *Id*; AR 720.

sobriety or periods of less alcohol."[223] As the court explained above, however, the records that the ALJ cited to did not provide substantial evidence that the plaintiff "significantly" improved during periods of less alcohol use.

The ALJ also found that Dr. Aames's opinion was inconsistent with the record from the plaintiff's admission at Atascadero State Hospital, during which the plaintiff "was presumably mostly sober."[224] The plaintiff was admitted to Atascadero State Hospital while he was in custody.[225] For the reasons set forth above, evidence of improvement during highly structured environment that does not separate out effects of the environment from those of sobriety fails to substantially evidence the materiality of substance use. *See* 78 Fed. Reg. 11945; *Belvin*, 2019 WL 4751875 at *5; *see also Pittaluga*, 2019 WL 2897849, at *1 (finding it "doubtful" to rely on jail records for mental health portrayal "because the jail environment is highly structured"). The ALJ thus did not provide specific and legitimate reasons, supported by substantial evidence in the record, in underweighing the treating psychologist's contradicted opinion.

Accordingly, because the ALJ erred by improperly weighing medical opinions, the court remands on this ground.

### 3. Whether the ALJ Erred in Failing to Consider All Relevant Evidence

The plaintiff also contends that the ALJ's RFC determination was not supported by substantial evidence.[226] Particularly, he argues that the ALJ's RFC finding did not include all of the limitations that Dr. Aames identified.[227]

The ALJ found that, without substance use, the plaintiff would have the following RFC:

> Capacity to perform light work . . . with no use of ladders, ropes or scaffolds; he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl;

---

[223] AR 25.

[224] *Id.*

[225] *See* AR 328.

[226] Pl. Mot. – ECF No. 19 at 19.

[227] *Id.*

> he could perform moderately complex work, but not work around hazards or fast-moving machinery or do rapid assembly work; he should have no responsibility for the safety of others; and he should have no required public interaction.[228]

In making the determination above as to the "mental portion" of the RFC, the ALJ accorded the most weight to the ME and little weight to the treating psychologist Dr. Aames.[229] Because the court remands for reweighing of medical-opinion evidence, the court remands on this basis too.[230]

### 4. Whether the ALJ Erred in Failing to Fully Develop the Record

The plaintiff argues that the ALJ failed to fully develop the record because the ALJ should have kept the record open after the plaintiff's hearings so that he could consider statements from treating doctors, Dr. Aames and Dr. Bird.[231] The Commissioner counters that the ALJ had no duty to keep the record open.[232] The court agrees that there was no duty here.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011); *see also id.* ("Rejection of the treating physician's opinion on ability to perform any remunerative work does not by itself trigger a duty to contact the physician for more explanation.").

Here, the ALJ did not have a duty to keep the record open to accept further findings from the plaintiff's treating doctors because the record was not ambiguous or inadequate as to whether the medical evidence in the record allowed proper evaluation. *See McLeod*, 640 F.3d at 885 ("The ALJ had no duty to request more information from the two [treating] physicians" because "substantially all of their medical records" were before the ALJ and "[t]here was nothing unclear

---

[228] AR 21.

[229] AR 24.

[230] The plaintiff also briefly argues that the ALJ erred by failing to make a determination about whether the plaintiff meets 12.08 Listing for Personality Disorders. *See* Pl. Mot. – ECF No. 19 at 20. The Commissioner contends this is not reversable error because the criteria for Listing 12.08 is the same as the other Listings that the ALJ did consider. Cross Mot. – ECF No. 24 at 17. The plaintiff did not respond to the Commissioner's argument or cite to supporting legal authority for his argument

[231] Pl. Mot. – ECF No. 19 at 20–21.

[232] Cross-Mot. – ECF No. 24 at 11.

or ambiguous about what they said"). The plaintiff cited to no legal authority supporting his position that the ALJ was required to keep the record open. The court does not remand on this basis.

### 5. Whether ALJ Erred in Rejecting the Plaintiff's Testimony

Finally, the plaintiff argues that the ALJ failed to provide "clear and convincing" evidence for rejecting the plaintiff's testimony about the severity of his symptoms.[233] This argument has merit.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112 (9th Cir. 2012). "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted). "The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

---

[233] Pl. Mot. – ECF 19 at 21.

In assessing the plaintiff's credibility, the ALJ concluded that "the evidence generally does not support the alleged loss of functioning without consideration of substance use."[234] The ALJ found the following about the plaintiff's testimony:

> The claimant testified that whether he is drinking or not, he wakes up every morning paranoid and afraid, worrying about being harmed, based on the things he has done in his past. However, this appears to be a normal reaction to his circumstances and does not indicate an inability to work. He has worked as a laborer in the past, and he lost that job (house painting) when his employer discovered his past crimes (testimony). He has also worked as staff at the residential recovery program and was fired due to relapsing, not because of poor job performance []. He testified that he was incarcerated for failing to register as a sex offender and he has spent most of his adult life incarcerated. All of this would explain an inability to obtain or maintain employment, but that is not the same as an inability to work (i.e., that does not satisfy the requirements for "disability.")[235]

The court agrees that the ALJ erred in rejecting the plaintiff's testimony. The ALJ did not determine whether the plaintiff provided "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112. Instead, the ALJ concludes, without citing to evidence, that the plaintiff's reported symptoms of paranoia even in the absence of alcohol use "appears to be a normal reaction" to his circumstances.[236] This conclusion is insufficient as a basis to find the plaintiff not credible. Furthermore, evidence that the plaintiff may have had difficulty obtaining or maintaining a job does not sufficiently explain why his testimony regarding the severity of his symptoms is not credible.

Accordingly, the court finds that the ALJ erred in rejecting the plaintiff's testimony and remands on this basis. To the extent the ALJ's discrediting of the plaintiff's testimony was based in part on his assessment of the medical evidence, including Dr. Aames's evaluation, the court remands on this ground too.

---

[234] AR 25.

[235] *Id.*

[236] *Id.*

**6. Whether the Court Should Remand for Further Proceedings or Determination of Benefits**

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1077 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

The court finds that remand is appropriate to "remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d at 635 (alteration in original)).

## CONCLUSION

The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: March 19, 2020

_____
LAUREL BEELER
United States Magistrate Judge